Brandon J. Mark (10439)
PARSONS BEHLE & LATIMER
201 South Main Street, Suite 1800
Salt Lake City, Utah  84111
Telephone: (801) 532-1234
Facsimile: (801) 536-6111
Email: bmark@parsonsbehle.com

Robert J. Nelson (*pro hac vice* admission to be sought)
Lexi J. Hazam (*pro hac vice* admission to be sought)
LIEFF CABRASER HEIMANN & BERNSTEIN LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000
Facsimile: (415) 956-1008
Email: rnelson@lchb.com
Email: lhazam@lchb.com

*Attorneys for Relator and Plaintiff Jack Suenram*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* JACK D. SUENRAM,<br><br>Plaintiffs,<br><br>v.<br><br>EDUTREK, LLC, a Utah limited liability company, and its apparent successor in interest, DAY PACER LLC, a Utah limited liability company, formerly known as COLLEGE CRITERIA, LLC, a Utah limited liability company; APOLLO EDUCATION GROUP, INC., an Arizona corporation; ITT EDUCATIONAL SERVICES, INC., a Delaware corporation; DEVRY EDUCATION GROUP, a Delaware corporation; EDUCATION CORPORATION OF AMERICA, a Delaware corporation; ZENITH EDUCATION GROUP, INC., a Delaware corporation, as successor in interest to CORINTHIAN COLLEGES, INC.; GRAND CANYON EDUCATION, INC., a Delaware corporation; CAREER | **FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**<br><br>**CLERK: DO NOT DOCKET**<br><br><br><br><br><br>Case No.:<br><br><br>**COMPLAINT**<br><br><br>JURY TRIAL DEMANDED |

1310410.1

EDUCATION CORPORATION, a Delaware
corporation; COLORADO TECHNICAL
UNIVERSITY, INC., a Colorado corporation;
AMERICAN INTERCONTINENTAL
UNIVERSITY, INC., an Illinois corporation;
AIU ONLINE, LLC, an Illinois limited
liability company; SANFORD-BROWN,
LIMITED, INC., a New York corporation;
INTERNATIONAL ACADEMY OF
MERCHANDISING AND DESIGN, INC., a
Delaware corporation; CENTER FOR
EXCELLENCE IN HIGHER EDUCATION,
INC., an Indiana corporation; CONCORDE
CAREER COLLEGES, INC., a Missouri
corporation; TECHNICAL CAREER
INSTITUTES, INC., a New York
corporation; BES, Inc., a New Jersey
corporation; JONES INTERNATIONAL
UNIVERSITY, LIMITED, a Colorado
corporation; EDUCATION
MANAGEMENT CORPORATION, a
Pennsylvania corporation; EDUCATION
AFFILIATES, INC., a Maryland corporation;
BRIDGEPOINT EDUCATION, INC., a
California corporation; DELTA CAREER
EDUCATION CORPORATION, a Delaware
corporation; FULL SAIL, LLC, a Florida
limited liability company; and DOES 1-500,
Inclusive,

　　　　Defendants.

**TABLE OF CONTENTS**

I.      INTRODUCTION ...............................................................................................4

II.     JURISDICTION AND VENUE .......................................................................6

III.    PARTIES ...........................................................................................................7

      A.      Plaintiffs ................................................................................................. 7

      B.      Defendant EduTrek ................................................................................ 8

      C.      Defendant Schools ................................................................................. 9

IV.     FEDERAL FALSE CLAIMS ACT ...............................................................16

V.      TITLE IV OF THE HIGHER EDUCATION ACT OF 1965 ............................17

      A.      General Provisions ............................................................................... 17

      B.      Incentive Compensation Ban ............................................................... 19

      C.      Management Certification Requirement............................................... 23

      D.      Claims for Payment under Title IV Programs ..................................... 24

VI.     FACTUAL ALLEGATIONS ...........................................................................29

      A.      Defendant Schools' Submission of Program Participation Agreements to the Department of Education. ................................................................... 30

      B.      Title IV Funding Received by Defendant Schools. ............................. 31

      C.      Defendant Schools' Violations of the Incentive Compensation Ban.................... 32

      D.      Defendant Schools Violated the Incentive Compensation Ban and Incentive Compensation Regulations ................................................... 46

      E.      Defendant Schools' Submission of False Claims ............................... 51

      F.      Defendant EduTrek Conspired with Defendant Schools to Enroll Students in Violation of the Incentive Compensation Ban..................................... 53

VII.    CLAIMS FOR RELIEF. ..................................................................................54

VIII.   PRAYERS FOR RELIEF ...............................................................................58

IX.     JURY TRIAL DEMAND ................................................................................58

Relator and Plaintiff Jack D. Suenram ("Relator"), on behalf of himself and the United States of America, complains as follows:

I.    **INTRODUCTION**

1.    When Congress established federal student loan and grant programs to help students attend college, it imposed a number of important legal requirements on colleges and universities that receive such funding in order to ensure that the billions of dollars that taxpayers invest in higher education each year are spent wisely. Concerned that schools would aggressively recruit students to obtain loan funds that the students could not repay, Congress included a provision in the law that prevents schools that receive federal funding from paying incentive compensation—bonuses, commissions, and the like—to their recruiters. In 2011, in response to widespread reports of recruiting abuses, the Department of Education revised the applicable regulations and clarified that the ban on incentive compensation also applied to outside, third-party recruiters, preventing schools from avoiding the law simply by hiring others to do what they could not themselves.

2.    Even though the schools in this case were well aware of the regulatory changes in 2011, they have nevertheless paid commissions—a prohibited form of incentive compensation—to defendant EduTrek, LLC, for recruiting students since 2011. Moreover, EduTrek has itself paid prohibited incentive compensation to its recruiters during that same time period.

3.    What's more, EduTrek has used repugnant practices to obtain contact information of potential "students" for its highly motivated recruiters. As detailed below, EduTrek and its affiliates used websites that promised to help visitors find jobs or obtain government assistance if they provided their contact information. Instead of helping visitors with employment or Medicare, Edutrek used the websites merely to gather contact information

of people down on their luck, which its recruiters then used to call the unsuspecting website visitors and aggressively recruit them to attend one of EduTrek's for-profit client schools.

4. The claims set forth below arise from the conduct of Defendants Apollo Education Group, Inc.; ITT Educational Services, Inc.; DeVry Education Group; Education Corporation of America; Zenith Education Group, Inc., as successor in interest to Corinthian Colleges, Inc.; Grand Canyon Education, Inc.; Career Education Corporation; Colorado Technical University, Inc.; American InterContinental University, Inc.; AIU Online, LLC; Sanford-Brown, Limited, Inc.; International Academy of Merchandising and Design, Inc.; Center for Excellence in Higher Education, Inc.; Concorde Career Colleges, Inc.; Technical Career Institutes, Inc.; BES, Inc.; Jones International University, Limited; Education Management Corporation; Education Affiliates, Inc.; Bridgepoint Education, Inc.; Delta Career Education Corporation; Full Sail, LLC (collectively, "Defendant Schools"); EduTrek, LLC, d/b/a EdSoup; and others that violates (and has violated) the federal False Claims Act, 31 U.S.C. §§ 3729-33 ("FCA").

5. Defendant Schools knowingly presented and made, or caused to be presented and made, false claims and statements that were material to their receipt of funding from federal student aid programs authorized pursuant to Title IV of the Higher Education Act of 1965, as amended, 20 U.S.C. §§ 1070, *et seq.* ("Title IV programs"). Title IV programs, which are administered by the United States Department of Education ("Department of Education"), provide students with financial aid in the form of, among other things, federal Pell Grants, federal direct student loans, and loans guaranteed by the federal government.

6. From at least July 2011 to the present, Defendant Schools knowingly submitted, or caused to be submitted, tens of thousands of claims for payment to the Department of Education based on material false certifications and statements. During the same period of time,

Defendant Schools fraudulently induced the Department of Education into granting Defendant Schools eligibility to participate in Title IV programs when, in fact, Defendant Schools were ineligible to participate in those programs and knew that they intended to continue the practices that made them so ineligible.

7.      Since at least July 2011 to the present, Defendant EduTrek conspired with Defendant Schools to engage in conduct that led to the submission of claims to the Department of Education based on false certifications and statements.

8.      During the periods covered by this Complaint, Defendant Schools obtained billions of dollars in federal funds through Title IV programs that they were not eligible to receive. Because Defendant Schools were not eligible to receive these funds, the students attending the schools were also ineligible to receive any funds from Title IV programs.

9.      Because Defendant Schools have paid and continue to pay commissions to Defendant EduTrek and other third parties based directly on enrollment activities that Defendant EduTrek and those third parties performed, Defendant Schools violated and continue to violate the incentive compensation ban applicable to all schools that participate in Title IV programs, including for-profit, proprietary schools.

## II.    JURISDICTION AND VENUE

10.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1345, and 31 U.S.C. §§ 3730, 3732.

11.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a), which authorizes nationwide service of process, because Defendants transact business or are found in this District and because acts proscribed by 31 U.S.C. § 3729 occurred in this District.

12.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a), and under 28 U.S.C. §§ 1391(b) and 1395(a).

## III.    PARTIES

### A.    Plaintiffs

13.     Relator Jack D. Suenram is presently a resident and citizen of the State of Nebraska. From June 2010 to August 2012, Relator resided in Utah and worked as a "College Search Advisor" for Defendant EduTrek LLC, doing business as EdSoup (hereinafter referred to as "EduTrek"). Although Relator initially worked in EduTrek's call center in Salt Lake City, Utah (which later moved to Sandy, Utah), Relator began working remotely in approximately September 2011. From August 2012 to July 2014, Relator resided in Omaha, Nebraska, but continued to work remotely for EduTrek doing the same work he did when located in Utah.

14.     In his position at EduTrek, Relator learned of Defendant Schools' commission payments to EduTrek for enrollment-related activities performed by EduTrek employees. Such commission payments violated various laws, regulations, and express contractual certifications, as further described below.

15.     Relator brings this action for violations of the federal FCA on behalf of himself and the United States of America. Relator, through his work for EduTrek, has personal knowledge of the false records, statements, and claims presented to the government by and for the Defendant Schools named herein.

16.     As required under the FCA, 31 U.S.C. § 3730(b)(2), Relator has provided the United States Attorney and the United States Attorney General with written disclosures of substantially all material evidence and information supporting the allegations herein.

17.     Relator is an "original source" as that term is defined in the FCA. 31 U.S.C. § 3730(e)(4)(B). Relator has independent, material, and first-hand knowledge of the information

on which the allegations of fraudulent misconduct are based. Relator voluntarily provided such information to the Office of the Inspector General of the Department of Education, the Office of General Counsel to the Department of Education, and the United States Attorney for the District of Utah on October 28, 2014.

18.    The United States of America is named as a plaintiff because funds of the United States of America were (and are) awarded and paid to Defendant Schools in connection with Title IV programs, which payments are the result of the false claims alleged in this Complaint.

**B.    Defendant EduTrek**

19.    Defendant EduTrek is a Utah Limited Liability Company located at 1333 East 9400 South, Second Floor, Sandy, Utah 84093.

20.    In January 2016, EduTrek LLC allowed Day Pacer LLC, a Utah Limited Liability Company with close ties to EduTrek LLC, to register "EduTrek" as a fictitious name (i.e., as a d/b/a). EduTrek LLC's manager indicated in October 2015 that he intended to "dissolve EduTrek LLC" by the end of 2015. Because EduTrek failed to dissolve EduTrek by the end of 2015, the Utah Division of Corporation involuntarily dissolved it on March 31, 2016. It appears that EduTrek LLC has transferred all or part of its operations and assets to Day Pacer, LLC. If this is the case, then Day Pacer LLC is EduTrek LLC's successor in interest and liable for EduTrek LLC's actions, as alleged in this Complaint. On information, Relator believes and alleges that Day Pacer LLC is a mere continuation of EduTrek LLC, the transaction between the two companies is a de facto merger, and the transaction may be for the purpose of defrauding potential judgment creditors or for some other fraudulent purpose.

21.    According to EdSoup's website, it "is a sister company of College Directory Network and a division of SingleEdge Development." (http://www.edsoup.com/page/about-us/About-Us.html (last visited October 6, 2015).) The hyperlink on EdSoup's website for

"College Directory Network" directs the web browser to the URL "edutrek.com," which webpage displays an EduTrek logo.

### C.   **Defendant Schools**

22.   Defendant Schools operate for-profit (or "proprietary") postsecondary educational schools throughout the United States.

23.   During the periods relevant to this Complaint, Defendant Schools have received, and continue to receive, a substantial portion of their revenues from funds provided through Title IV programs.

24.   Apollo Education Group, Inc. ("AEG"), is an Arizona corporation with its principal place of business in Phoenix, Arizona. AEG operates for-profit colleges under the trade name University of Phoenix (and other names), at physical campuses throughout the United States and also through online degree programs. AEG entered into a program participation agreement with the Department of Education in November 2009, which expired on December 31, 2012. Its eligibility to receive funding from Title IV programs continues under that agreement on a month-to-month basis as the Department of Education evaluates its application for a new program participation agreement.

25.   ITT Educational Services, Inc. ("ITT"), is a Delaware corporation with its principal place of business in Carmel, Indiana. ITT operates a for-profit college at physical campuses throughout the country and also offers online degree programs. ITT is currently operating under a program participation agreement with the Department of Education and has been since at least July 2011.

26.   DeVry Education Group, Inc. ("DeVry"), is a Delaware corporation with its principal place of business in Downers Grove, Illinois. DeVry operates for-profit colleges including Carrington College, Chamberlain College of Nursing, and DeVry University.

DeVry's colleges operate under program participation agreements with the Department of Education and have been continuously since at least July 2011.

27.    Education Corporation of America, Inc. ("ECA"), is a Delaware corporation with its principal place of business in Birmingham, Alabama. ECA operates for-profit colleges including Virginia College, Kaplan College, and the Kaplan Career Institute.  ECA's colleges operate under program participation agreements with the Department of Education and have been continuously since at least July 2011.

28.    Career Education Corporation ("CEC") is Delaware corporation with its principal place of business in Schaumburg, Illinois. Colorado Technical University, Inc., American InterContinental University, Inc.; AIU Online, LLC; Sanford-Brown, Limited, Inc.; and International Academy of Merchandising and Design, Inc., are wholly owned subsidiaries of CEC. CEC, through these various subsidiaries, operates a number of for-profit colleges at physical campuses throughout the country and also through online degree programs. CEC directs and controls the actions of its subsidiaries, which, on information and belief, are nothing more than passive holding companies.

29.    Colorado Technical University, Inc. ("CTU"), is a Colorado corporation with its principal place of business in Schaumburg, Illinois. CTU operates a number of campuses in Colorado and offers online courses nationwide. CTU is a wholly owned subsidiary of CEC. CTU is currently operating under a program participation agreement with the Department of Education and has been since at least July 2011. Its current program participation agreement expired on September 30, 2011, and it has been operating on month-to-month continuing program participation agreements since that time.

30.    American InterContinental University, Inc. ("AIU"), is an Illinois corporation with its principal place of business in Schaumburg, Illinois. AIU is wholly owned by CEC, and

together with AIU Online, LLC, operates for-profit colleges at physical campuses throughout the country and through online degree programs. AIU is currently operating under a program participation agreement with the Department of Education and has been since at least July 2011. Its current program participation agreement expired on March 31, 2013, and it has been operating on month-to-month continuing program participation agreements since that time.

31.     AIU Online, LLC, is an Illinois limited liability company with its principal place of business in Schaumburg, Illinois. AIU Online is wholly owned by CEC. AIU Online operates for-profit colleges offering online degree programs. AIU Online is currently operating under a program participation agreement with the Department of Education and has been since at least July 2011. Its current program participation agreement expired on March 31, 2013, and it has been operating on month-to-month continuing program participation agreements since that time.

32.     Sanford-Brown, Limited, Inc. ("SBL"), is a New York corporation with its principal place of business in Schaumburg, Illinois. SBL operates for-profit colleges under the trade name Sanford-Brown Institute at physical campuses throughout the country and through online degree programs. It is a wholly owned subsidiary of CEC. On December 10, 2007, Gary McCullough, then President and Chief Executive Officer of CEC, signed a program participation agreement with the Department of Education on behalf of certain campuses of SBL. Steve Lesnik, then President and Chief Executive Officer of CEC, signed a new program participation agreement for certain campuses of SBL on February 1, 2012. All campuses of SBL have been operating under program participation agreements at all periods relevant to this Complaint, which were executed by representatives of SBL at various times. SBL's campuses have been operating on month-to-month continuing program participation agreements since

the expiration of the latest program participation agreements relevant to each campus or program.

33.     International Academy of Merchandising and Design, Inc. ("IAMD"), is a Delaware corporation with its principal place of business in Schaumburg, Illinois. IAMD operates for-profit colleges under the trade name Sanford-Brown College at physical campuses throughout the country and through online degree programs. It is a wholly owned subsidiary of CEC. All campuses of IAMD have been covered by program participation agreements signed by affiliated Sanford-Brown College campuses; for example, the Detroit and Nashville IAMD campuses are covered under the program participation agreement for the Chicago campus of Sanford-Brown, which expired on June 30, 2014. IAMD's campuses have been operating on month-to-month continuing program participation agreements since the expiration of the latest program participation agreements relevant to each campus or program.

34.     Grand Canyon Education, Inc. ("GCE"), is a Delaware corporation with its principal place in Arizona. It operates campuses throughout Arizona and offers online programs under the trade name "Grand Canyon University." GCE entered into a provisional program participation agreement in April 8, 2011. On October 28, 2013, GCE entered into a new program participation agreement with the Department of Education.

35.     Education Management Corporation ("EMC") is a Pennsylvania corporation with its principal place of business in Pittsburgh, Pennsylvania. EMC, through various passive holding companies, wholly owns, controls, directs, and operates schools under the trade name Argosy University. Argosy University is for-profit school offering education at physical campuses throughout the country and through online degree programs. As of October 2013, students enrolled at Argosy University represented approximately 19% of EMC's 125,560 total enrollments. (It was a similar percentage in 2012.) On February 4, 2010, Craig Swenson signed

a program participation agreement with the Department of Education on behalf of Argosy University. Argosy University is currently operating under provisional program participation agreement with the Department of Education.

36.    Education Affiliates, Inc. ("EA"), is a Maryland corporation with its principal place of business in White Marsh, Maryland. EA operates for-profit colleges under the trade names All State Career, Fortis Institute, and Fortis College at physical campuses throughout the country and also through online degree programs. All State Career, Fortis Institute, and Fortis College are currently operating under program participation agreements with the Department of Education and have been continuously since at least July 2011.

37.    Zenith Education Group, Inc. ("ZEG"), is a Delaware corporation and the successor in interest to Corinthian Colleges, Inc. Corinthian Colleges sold its colleges operating under the trade names Everest College, Everest University, and Everest Institute (the "Everest Schools") to ZEG when Corinthian Colleges ceased operations in 2015. The Everest Schools operate for-profit colleges at several physical campuses throughout the country and also through online degree programs. On February 10, 2011, Corinthian College's Chairman and CEO, Jack Massimino, signed a program participation agreement with the Department of Education on behalf of the Everest Schools. Certain Everest Schools entered into further program participation agreements with the Department of Education in early 2014. ZEG entered into new program participation agreements with the Department of Education for the Everest Schools in February 2015.

38.    Center for Excellence in Higher Education, Inc. ("CEHE"), is an Indiana corporation with its principal place of business in Murray, Utah. CEHE owns and operates a number of for-profit colleges, including Stevens-Henager College, CollegeAmerica, and California College of San Diego. CEHE offers online courses through an operating division

called Independence University. All of the schools operated by CEHE entered into a program participation agreement with Department of Education prior to July 2011, and they have been operating under a program participation agreement all times relevant to this Complaint. Eric Juhlin, CEHE's CEO, signed program participation agreements for the various CEHE schools on January 25 and 30, 2013, which replaced earlier program participation agreements for the schools. The earlier program participation agreements were signed on behalf of CEHE's schools by Suzanne Scales on November 9, 2011 (CollegeAmerica), Nathan Larson on June 14, 2007 (CollegeAmerica), Barbara Thomas on July 30, 2008 (California College of San Diego), Vicky Dewsnup on January 21, 2010 (Stevens-Henager College).

39. Bridgepoint Education, Inc. ("BEI"), is a California corporation with its principal place of business in San Diego, California. BEI operates for-profit colleges at various physical campuses and also offers online degree programs under the trade name Ashford University, which it operates through a wholly owned subsidiary, Ashford University, LLC. BEI is currently operating under a program participation agreement with the Department of Education and has been continuously since at least July 2011.

40. Concorde Career Colleges, Inc. ("CCI"), is a privately held Missouri corporation with its principal place of business in Mission, Kansas. CCI operates for-profit colleges at various physical campuses throughout the country and also offers online degree programs. CCI is currently operating under a program participation agreement with the Department of Education and has been continuously since at least July 2011.

41. Technical Career Institutes, Inc. ("TCI"), is a New York corporation with its principal place of business in New York City, New York. TCI operates a for-profit college at physical campuses in New York and through online degree programs under the trade names Technical Career Institutes and TCI College. TCI is a wholly owned subsidiary of EVCI

Career Colleges Holding Corp. TCI is currently operating under a program participation agreement with the Department of Education and has been continuously since at least July 2011.

42.    BES, Inc., is a New Jersey corporation with its principal place of business in New Jersey. BES operates a for-profit college, through a wholly owned subsidiary dominated and controlled by BES, under the trade name Berkeley College, which has physical campuses in New Jersey and New York and also offers online degree programs. Berkeley College is currently operating under a program participation agreement with the Department of Education and has been continuously since at least July 2011.

43.    Jones International University, Limited ("Jones International"), is a Colorado corporation with its principal place of business in Centennial, Colorado. Jones International operated an online-based for-profit college until April 2015, when the college announced it would no longer accept new students. Jones International has assisted students to transfer to Trident University International, LLC, a California limited liability company, which may be a successor to Jones International for purposes of the claims alleged herein.

44.    Full Sail, LLC ("Full Sail"), is a Florida limited liability company with its principal place of business in Winter Park, Florida. Full Sail operates for-profit colleges at various physical campuses and also offers online degree programs throughout the country. Full Sail is currently operating under a program participation agreement with the Department of Education and has been continuously since at least July 2011.

45.    Delta Career Education Corporation ("DCE") is a Delaware corporation with its principal place of business in Virginia Beach, Virginia. DCE operates for-profit colleges at various physical campuses and also offers online degree programs throughout the country under the trade names Miller-Motte College and Miller-Motte Technical College (collectively,

"Miller-Motte"). Miller-Motte is currently operating under a program participation agreement with the Department of Education and has been continuously since at least July 2011.

46.     The terms "Defendants" and "Defendant Schools" will refer to the Defendants identified herein acting by and through their managerial employees.

47.     Managerial employees of Defendants, in doing the acts and things described in this Complaint, were acting within the course and scope of their respective agencies and/or employment with Defendants, and each of them, with the knowledge and consent of the Defendants, and each of them, unless otherwise indicated.

## IV.   FEDERAL FALSE CLAIMS ACT

48.     For violations occurring on or after May 20, 2009, the false claims provision of the FCA, at 31 U.S.C. § 3729(a)(1)(A) (2009), as amended by the Fraud Enforcement and Recovery Act of 2009 ("FERA"), provides in pertinent part that any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" shall be liable to the United States Government.

49.     The FCA defines the term "claim" to mean

> any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded . . . .

31 U.S.C. § 3729(b)(2)(A) (2009).

50.     As amended by FERA, the false statements provision of the FCA makes liable any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B) (2009).

51.     The FCA makes liable any person who "conspires to commit a violation" of the FCA in the manner described in paragraphs 49 and 50 above.  31 U.S.C. § 3729(a)(1)(C).

52.     The FCA, as amended by FERA, defines "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4) (2009).

53.     The FCA defines the terms "knowing" and "knowingly" to mean that a person, with respect to information: (1) "has actual knowledge of the information"; (2) "acts in deliberate ignorance of the truth or falsity of the information"; or (3) "acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b) (1986); 31 U.S.C. § 3729(b)(1)(A) (2009). The FCA further provides that "no proof of specific intent to defraud" is required. 31 U.S.C. § 3729(b) (1986); 31 U.S.C. § 3729(b)(1)(B) (2009).

## V.     TITLE IV OF THE HIGHER EDUCATION ACT OF 1965

### A.     General Provisions

54.     Under Title IV of the Higher Education Act of 1965 ("HEA"), 20 U.S.C. §§ 1070, *et seq.*, Congress established various student loan and grant programs, including but not limited to the Federal Pell Grant Program ("Pell Grant program"), the Federal Family Education Loan Program ("FFELP"),[1] and the Federal Direct Loan Program ("FDLP") (collectively "Title IV funding") in order to financially assist eligible students to obtain a post-secondary education.

---

[1] No new loans were made under FFELP after July 1, 2010.

55.    Although the mechanism by which Title IV funding is disbursed to eligible students under the Title IV programs varies by program, each Title IV program requires compliance with specific conditions and obligations, and certification of compliance with such conditions and obligations, as a prerequisite to obtaining Title IV funding.

56.    In order to become eligible to receive Title IV funding under programs such as the Pell Grant program, FFELP, or FDLP, or to have their students receive Title IV funding, schools must first complete the Department of Education's Application for Approval to Participate in the Federal Student Financial Aid Programs through the Electronic Application for Program Participation. Additionally, schools must periodically re-certify their participation in the Title IV programs and must submit an application during the recertification process.

57.    In the Application for Approval to Participate in the Federal Student Financial Aid Programs, the president, CEO, or chancellor of each school must

> certify that, to the best of my knowledge and belief, all information in this document is true and correct. I understand that if my institution provides false or misleading information, (a) the U.S. Department of Education may deny the institution's request for eligibility to participate in federal student financial aid programs and/or revoke eligibility once it has been granted and (b) the institution may be liable for all federal student financial aid funds it or its students received.

58.    Once a school's application to participate in Title IV programs is accepted, and before it receives any funds, it must first enter into a program participation agreement ("PPA") with the Department of Education. 20 U.S.C. § 1094(a); 34 C.F.R. § 668.14.

59.    Each PPA expressly conditions a school's initial and continuing eligibility to receive funds under Title IV programs on compliance with specific statutory requirements, including 20 U.S.C. § 1094 and 34 C.F.R. § 668.14.

**B.    Incentive Compensation Ban**

60.    Section 487(a)(20) of Title IV of the HEA explicitly requires that in order to receive Title IV funding, schools must "not provide any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the award of student financial assistance." 20 U.S.C. § 1094(a)(20) ("Incentive Compensation Ban"). Title IV of the HEA expressly conditions the initial and continuing eligibility of schools to obtain Title IV funding on the requirement that the schools comply with the Incentive Compensation Ban and certify such compliance in numerous ways.

61.    The Department of Education's regulations further reiterate that schools must comply with the Incentive Compensation Ban in order to be eligible to receive Title IV funding and that schools must expressly agree to the Incentive Compensation Ban in PPAs. 34 C.F.R. § 668.14(b)(22) ("Incentive Compensation Regulations").

62.    In each PPA, a school certifies that "[t]he execution of this Agreement by the Institution and the Secretary is a prerequisite to the Institution's initial or continued participation in any Title IV Program." (*See* Example PPA at 1, attached hereto as Exhibit 1.) The PPA further states that a school's participation in Title IV programs is "subject to the terms and conditions set forth in this Agreement." (*Id.*)

63.    The PPA provides, among other things, that

> [b]y entering into this Program Participation Agreement, the Institution agrees that . . . (22) It will not provide, ***nor contract with any entity that provides***, any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the awarding of student financial assistance . . . .

(*Id.* at 4, 6 (emphasis added).) This certification is a critical prerequisite for a school's eligibility to request and receive Title IV funding.

64.     Congress enacted the prohibition against paying commissions, bonuses, or other incentive payments based on success in recruiting students because such payments were associated with high loan default rates, which in turn resulted in a significant drain on program funds. When Congress amended the HEA in 1992 to prohibit schools from paying these incentives, it did so based on evidence of serious program abuses, including the payment of incentive compensation to motivate admissions personnel to enroll students without regard to the students' ability to benefit from the education. S. Rep. No. 58, 102d Cong., 1st Sess., at 8 (1991) ("Abuses in Federal Student Aid Programs") (noting testimony "that contests were held whereby sales representatives earned incentive awards for enrolling the highest number of students for a given period"); H.R. Rep. No. 447, 102d Cong., 2d Sess., at 10, reprinted in 1992 U.S.C.C.A.N. 334, 343 (noting new provisions that "include prohibiting the use of commissioned sales persons and recruiters"). The U.S. Senate committee with oversight responsibility acknowledged that systemic fraud and abuse continues unabated among for-profit colleges. S. Comm. on Health, Education, Labor, and Pensions, 112th Cong., For Profit Higher Education: The Failure to Safeguard the Federal Investment and Ensure Student Success (Comm. Print July 30, 2012).

65.     Due to continuing violations of the Incentive Compensation Ban in the for-profit college sector, in June 2010, the Department of Education proposed substantial revisions to the Incentive Compensation Regulations. The Department explained that the proposed revisions were necessary because "the Department's experience demonstrates that unscrupulous actors routinely rely upon [perceived ambiguities in the existing regulations] to circumvent the intent of section 487(a)(20) of the HEA." Incentive Compensation (§ 668.14(b)), 75 Fed. Reg.

34816, 34817 (June 18, 2010). The Department concluded that "rather than serving to effectuate the goals intended by Congress through its adoption of section 487(a)(20) of the HEA, the [existing regulations] have served to obstruct those objectives." *Id.*

66.    The Department of Education promulgated final regulations revising the Incentive Compensation Regulations on October 29, 2010, effective July 1, 2011. Program Integrity Issues, 75 Fed. Reg. 66832, 66832 (Oct. 29, 2010); 34 C.F.R. § 668.14(b)(22) (2011).

67.    Effective July 2011, the Incentive Compensation Regulations provide that "*Commission, bonus, or other incentive payment* means a sum of money or something of value, other than a fixed salary or wages, paid to or given to a person or *an entity* for services rendered." 34 C.F.R. § 668.14(b)(22)(iii)(A) (2011) (emphasis added).

68.    The Incentive Compensation Regulations further define what activities are considered "securing enrollments or the award of financial aid" under the statute. It includes any activity "that a person *or entity* engages in at any point in time through completion of an educational program for the purpose of the admission or matriculation of students for any period of time or the award of financial aid to students." 34 C.F.R. § 668.14(b)(22)(iii)(B) (emphasis added).

69.    The regulations further emphasize the broad nature of this definition: "These activities include *contact in any form with a prospective student*, such as, but not limited to— contact through preadmission or advising activities, scheduling an appointment to visit the enrollment office or any other office of the institution, attendance at such an appointment, or involvement in a prospective student's signing of an enrollment agreement or financial aid application." 34 C.F.R. § 668.14(b)(22)(iii)(B)(1) (emphasis added).

70.    During the notice-and-comment rulemaking procedure resulting in these 2011 regulatory changes, several commenters specifically asked the Department of Education to

clarify how the rules would affect the schools' relationships with entities like EduTrek, which "assist an institution with the institution's outreach efforts," including "identifying students, offering counseling and information on multiple institutions, and encouraging potential students to fill out an application directly with the individual institutions." 75 Fed. Reg. 66832, 66878 (Oct. 29, 2010). Other commenters asked about similar "arrangements under which institutions pay third parties for student contact information and asked whether such information may be sorted or qualified." *Id.*

71.    In response, the Department of Education explained that the definition of "securing enrollments" in the proposed rules "specifically include[s] (as examples) contact through preadmission or advising activities, scheduling an appointment for the prospective student to visit the enrollment office or any other office of the institution, attendance at such an appointment, or involvement in a prospective student's signing of an enrollment agreement or financial aid application." *Id.*

72.    The Department of Education also revised its proposed rules to specifically address how companies like EduTrek would be treated under the new regulations. As the Department of Education explained, it "also revised the definition [of securing enrollments] to clarify that it does not include making a payment to a third party for the provision of student contact information *provided that such payment is not based on any additional conduct by the third party, such as participation in preadmission or advertising activities, scheduling an appointment to visit the enrollment office or any other office of the institution or attendance at such an appointment*, or the signing, or being involved in the signing of a prospective student's enrollment agreement or financial aid application." *Id.* (emphasis added).

73.    These changes are now reflected at 34 C.F.R. § 668.14(b)(22)(iii)(B)(2), which provides that the Incentive Compensation Ban does not cover "making a payment to a third

party for the provision of student contact information for prospective students *provided that such payment is not based on . . . [a]ny additional conduct or action by the third party or the prospective students, such as participation in preadmission or advising activities, scheduling an appointment* to visit the enrollment office or any other office of the institution or attendance at such an appointment, or the signing, or being involved in the signing, of a prospective student's enrollment agreement or financial aid application." (emphasis added).

74.    In its March 2011 "Dear Colleague Letter" explaining the regulatory changes, the Department of Education further described the types of actions that were considered "recruitment activities" subject to the Incentive Compensation Ban. Such recruitment activities include "Targeted information dissemination; Solicitations to individuals; [and] Contacting potential enrollment applicants."

75.    Compliance with the Incentive Compensation Ban and the Incentive Compensation Regulations are material to the Department of Education's payment of the Title IV program funds to Defendant Schools. The Department of Education has routinely sought to recover funds from schools later found to have violated the the Incentive Compensation Ban and Incentive Compensation Regulations, and the Department of Education will not pay Title IV program funds to schools in violation of the Incentive Compensation Ban and Incentive Compensation Regulations.

### C.    Management Certification Requirement

76.    In order to maintain its eligibility to receive Title IV funding, each year that a school participates in any Title IV program, the school also must provide the Department of Education with an annual compliance audit of its administration of Title IV programs, as well as an audit of the school's general purpose financial statements, prepared by independent auditors. 20 U.S.C. § 1094(c)(1)(A); 34 C.F.R. §§ 668.23(a)(2), (a)(4). For-profit educational

institutions, such as Defendant Schools, must conduct their annual financial statements and compliance audits in accordance with the Department of Education Office of Inspector General's Audit Guide.

77.     The Department of Education uses the results of the compliance and financial statements audits in part to determine whether schools receiving Title IV funding are adhering to applicable requirements for Title IV programs, including the Incentive Compensation Ban, and whether to allow the schools to continue receiving funds from Title IV programs.

78.     As part of the annual audits, Defendant Schools are required to certify, in the form of written "Required Management Assertions," that, among other things, they are complying with the requirements for eligibility to participate in Title IV programs, including the Incentive Compensation Ban. (*See* Department of Education Audit Guide ("Audit Guide") at II-3, attached hereto as Exhibit 2.) Specifically, Defendant Schools must certify in their "Required Management Assertions" regarding "Institutional Eligibility and Participation" that they have "[n]ot paid to any persons *or entities* any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments, financial aid to students, or student retention [34 C.F.R. § 668.14(b)(22)]." (*Id.* at p. II-4 (emphasis added).)

**D.      Claims for Payment under Title IV Programs**

79.     After a school becomes eligible to receive Title IV funding by entering into a PPA, claims for payment of those funds can be made in various ways. Under the Pell Grant program and FDLP, for example, students submit requests for funding directly to the Department of Education or to the Department of Education with the assistance of schools. Under FFELP, students and schools jointly submitted requests to private lenders for loans that were guaranteed by state agencies that were, in turn, insured by the Department of Education, which paid in the event of a default.

80. With respect to all Title IV programs, the disbursement of Title IV funding depends on a school's statements and certifications of compliance with various requirements, which are necessary for requests for payment to be considered.

81. For all Title IV programs, students who are interested in receiving federal student aid must complete a "Free Application for Federal Student Aid," known as a "FAFSA."

### Title IV Grant Programs

82. Under the Pell Grant program, which provides federal funds to assist postsecondary school students with demonstrated financial need, 20 U.S.C. § 1070a; 34 C.F.R. § 690.1, the student initiates the process by submitting a FAFSA to the Department of Education to have her expected family contribution ("EFC") calculated in order to receive an accurate amount of Pell Grant program funds. 34 C.F.R. § 690.12(a). The student either sends the FAFSA directly to the Department of Education or provides it to a school for the school to transmit it to the Department of Education on the student's behalf. 34 C.F.R. § 690.12(b).

83. The Department of Education sends the student's application information and EFC to the student on a Student Aid Report ("SAR") and sends each school the student has designated an Institutional Student Information Record ("ISIR") for that student. 34 C.F.R. § 690.13.

84. The school uses the above-described information, including the EFC, to calculate the student's eligibility for all aid and to assemble a "financial aid award package" for the student borrower. The financial aid package may include Pell Grants, FDLP loans, or Campus-Based Aid (which in turn includes Federal Supplemental Educational Opportunity Grants, Federal Work-Study, and Federal Perkins Loans), as well as other scholarships or aid for which the student may be eligible.

85. The student can accept all or part of the financial aid award package.

86.    If the student accepts a Pell Grant, an FDLP loan (for which the Department of Education is both lender and guarantor), or both a Pell Grant and a FDLP loan, the school creates an electronic "origination" record that the school submits to a Department of Education computerized database called the Common Origination and Disbursement ("COD") system. The origination record includes student demographic data, the award or payment period, the award amount, and disbursement dates and amounts. The COD database, in turn, links the information in the origination record to another Department of Education database, called CPS, which compares the information in the origination record to the information on the student's SAR and ISIR.

87.    Provided that the information submitted by the school is consistent with the information possessed by the Department of Education, the Department of Education makes funds available for the school to electronically draw down from a computerized system known as "G5."

88.    Schools must electronically certify in G5 prior to drawing down the funds that "by processing this payment request . . . the funds are being expended within three business days of receipt for the purpose and condition[s] of the [Program Participation] agreement." (*See* Example of G5 Certification, attached hereto as Exhibit 3.) Unless schools submit the express certifications of compliance with the PPAs, they cannot receive any funds from Title IV programs. If the Department of Education was aware that any school's G5 certification was false, the Department of Education would not make payments to the school.

89.    In addition to the Pell Grants themselves, the Department of Education also pays to the school an annual administrative cost allowance of $5.00 for each student who receives a Pell Grant, to be used to pay the costs of administering the Pell Grant and other Title IV federal student aid programs. 20 U.S.C. § 1096; 34 C.F.R. § 690.10.

**FDLP and FFELP Loan Programs**

90.     The FDLP, through which the Department of Education makes loans directly to eligible students and parents, "enables an eligible student or parent to obtain a loan to pay for the student's cost of attendance at [an eligible] school." 34 C.F.R. § 685.101(a)(1).

91.     Under the FFELP, which included subsidized and unsubsidized Stafford Loans, private "lenders use their own funds to make loans to enable a student or his or her parents to pay the costs of the student's attendance at postsecondary schools." 34 C.F.R. § 682.100(a). "[A] guaranty agency guarantees [the private] lender against losses due to default by the borrower on a FFEL loan," and "the guaranty agency is reimbursed by the [Department of Education] for all or part of the amount of default claims it pays to lenders." 34 C.F.R. § 682.100(b)(1). In this way, the government is ultimately called upon to satisfy claims for payment.

92.     No new loans were made under FFELP after July 1, 2010. *See* Health Care and Education Reconciliation Act of 2010 (P.L. 111-152).

93.     Like the Pell Grant program, students seeking to obtain a FDLP or FFELP loan begin by completing and submitting a FAFSA. 34 C.F.R. § 685.201(a); 34 C.F.R. § 682.102(a).

94.     In order to participate in the FDLP and FFELP, as opposed to a grant program, a student also completes a Master Promissory Note ("MPN") and submits the MPN to the educational institution. 34 C.F.R. § 685.201; 34 C.F.R. § 682.102.

95.     Parents may also borrow money through the FDLP and FFELP, in the form of a Parent PLUS loan, to help pay tuition and other related costs of education for their children. 34 C.F.R. § 685.200(c); 34 C.F.R. § 682.102(c). A parent borrower commences the loan process by completing and submitting a Direct PLUS MPN for a Parent Direct PLUS loan, 34 C.F.R. § 685.201(b), or an application for a PLUS loan under FFELP, 34 C.F.R. § 682.102(c).

96.    For student loans, schools participating in the FDLP must at a minimum create a loan origination record and ensure that the loan is supported by a completed MPN. 34 C.F.R. § 685.201(a)(2)(i), (ii). For parent direct loans, a participating school must complete and submit its portion of the PLUS MPN. 34 C.F.R. § 685.201(b)(3).

97.    A school participating in the FDLP or FFELP must determine and certify that the student is eligible to receive the loan and must provide information regarding student eligibility to the Department of Education. 34 C.F.R. § 685.301(a)(1), (2); 34 C.F.R. § 682.102(a); 34 C.F.R. § 682.603(a). Among other requirements, to be eligible to receive proceeds from a FDLP or FFELP loan, a student must be enrolled, or accepted for enrollment, at a school eligible to receive Title IV funding. 34 C.F.R. § 685.301(a)(2)(i); 34 C.F.R. § 685.200(a)(1)(ii); 34 C.F.R. § 668.32(a)(1)(i); 34 C.F.R. § 682.201(a); 34 C.F.R. § 682.603(a).

98.    As described above, for a school to be eligible to participate in Title IV programs, thereby making students attending the school eligible for FDLP and FFELP loans, a school must comply with the Incentive Compensation Ban. By certifying that any student is eligible to receive a FDLP or FFELP loan, the school is certifying its own eligibility to participate in the programs, including its compliance with the Incentive Compensation Ban.

99.    As described above, a school participating in the FDLP also determines the amount of each type of FDLP loan (subsidized or unsubsidized), as well as other types of financial aid that the student is eligible to receive based on information provided by the student in the FAFSA and from other available sources. 34 C.F.R. §§ 685.301(4), (5). The school submits this information to the COD system.

100.    Schools must verify that a student remains eligible to receive FDLP and FFELP loan proceeds at the time of disbursement. Direct Loans School Guide at 5-66; Department of Education, Federal Student Aid Handbook at 3-135 (2010-11).

101.    Schools receive the proceeds of FDLP loans for disbursement through the G5 system. As described above, schools must electronically certify in G5 prior to drawing down the funds that "by processing this payment request . . . the funds are being expended within three business days of receipt for the purpose and condition[s] of the [Program Participation] agreement." (G5 Certification, Exhibit 3 hereto.) Unless schools submit the express certifications of compliance with the PPAs, they cannot receive any funds from Title IV programs. If the Department of Education was aware that any school's G5 certification was false, the Department of Education would not make payments to the school.

102.    Under FFELP, the school submitted the MPN to the lender. Upon approval by the lender, the lender obtained a loan guarantee from a guarantee agency. 34 C.F.R. § 682.102. The loan was made in reliance upon the accuracy of the information provided by the school.

103.    The lender transferred the FFELP funds directly into the school's account. Upon receiving the FFELP funds, the school credited a student's account at the school for education-related expenses, such as tuition, fees, books, and supplies.

104.    For subsidized Stafford loans, the government paid the interest on the student's behalf during the time the student was enrolled in school on at least a half-time basis and during the student's grace period before repayment commences. 34 C.F.R. § 682.102(d)(2).

105.    In the event of default on a FFELP loan, the Department of Education paid to the guarantee agency all or part of the unpaid principal and accrued interest, as well as a variety of administrative costs. 34 C.F.R. § 682.404.

## VI.    FACTUAL ALLEGATIONS

106.    Defendant Schools knowingly made false statements, certifications, and claims regarding compliance with the Incentive Compensation Ban in order to become and remain eligible to receive Title IV funding. Defendant Schools' statements were false when made, and

caused the Department of Education to pay various claims under Title IV programs that Defendant Schools were not eligible to receive.

107.    Specifically, Defendant Schools falsely certified to the Department of Education that (1) they were not providing, and would not provide, any commission, bonus, or other incentive payment to any person or entity based directly or indirectly on success in securing enrollments, and (2) they were not contracting with, and would not contract with, any person providing commissions to any person or entity based directly or indirectly on success in securing enrollments.

108.    Defendant EduTrek conspired with each of the Defendant Schools to present, or cause to be presented, to the Department of Education false or fraudulent claims for payment or approval. Likewise, EduTrek conspired with Defendant Schools to make false statements to the Department of Education that were material to false claims submitted by Defendant Schools.

**A.      Defendant Schools' Submission of Program Participation Agreements to the Department of Education.**

109.    Defendant Schools sign and submit PPAs to the Department of Education in order to participate in Title IV programs. All Defendant Schools are currently operating under approved PPAs and have been since at least July 2011.

110.    In each PPA, each Defendant School further certifies that "[i]t will not provide, *nor contract with any entity that provides*, any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons *or entities* engaged in any student recruiting or admission activities or in making decisions regarding the awarding of student financial assistance." (emphasis added).

111.    In addition to the certifications they make in the PPAs, Defendant Schools also make, or cause to be made, additional certifications as part of their annual compliance audits

and as part of the student financial aid process, including but not limited to Required Management Assertions, G5 Certifications, Master Promissory Notes, and their accompanying school certifications.

112.    Defendant Schools submitted and continue to submit a variety of claims to the government for Title IV funding that they know to be false based upon their non-compliance with the Incentive Compensation Ban.

### B.    Title IV Funding Received by Defendant Schools.

113.    Each of the Defendant Schools has received a substantial amount of money from the federal government through Title IV funding. Below are examples of the amounts of Title IV funding that Defendants Schools have received and, where available, their annual revenues.

114.    For fiscal year 2014, Defendant AEG reported revenues of $3.0 billion; for fiscal year 2013, it reported revenues of $3.6 billion; for fiscal year 2012, it reported revenues of $4.3 billion; and for fiscal year 2011, it reported revenues of $4.7 billion. University of Phoenix represented approximately 90% of AEG's revenues for these periods. According to AEG, over 80% of its revenues for the University of Phoenix came from Title IV programs in fiscal years 2011, 2012, 2013, and 2014.   For fiscal year 2014, the University of Phoenix received $2,647,143,934.74 in Title IV funding.

115.    In fiscal years 2014 and 2013, Defendant BEI's Ashford University received $770,441,400 and $978,095,658 in Title IV funding, respectively.

116.    For the fiscal year ended December 31, 2011, Defendant CEC received approximately $1.4 billion in funds from Title IV programs. For the fiscal year ended December 31, 2012, CEC received approximately $1 billion in funds from Title IV programs. For the fiscal year ended December 31, 2013, CEC received approximately $807.5 million in

funds from Title IV programs. For the fiscal year ended December 31, 2014, CEC received approximately $695 million in funds from Title IV programs.

117.    In fiscal years 2014 and 2013, Defendant CEHE's Stevens-Henager College received $108,120,667 and $102,302,438 in Title IV funding, respectively.

118.    In fiscal year 2011, Defendant EMC received more than $2.7 billion in funds from Title IV programs. In fiscal year 2012, EMC received more than $2.3 billion in funds from Title IV programs. In fiscal year 2013, EMC received nearly $2 billion in funds from Title IV programs. In fiscal year 2014, EMC received over $1.8 billion in Title IV program funds.

119.    For fiscal year 2014, Defendant GCE's revenues were $691.1 million, more than 75% of which came from Title IV programs. GCE's revenues in fiscal years 2013, 2012, and 2011 were $598.3 million, $511.3 million, and $426.7 million, respectively, with even larger percentages coming from Title IV programs.

120.    Defendant ITT received approximately $870 million from Title IV programs in fiscal year 2013. It received about $1 billion in 2012 and over $1.5 billion in 2011.

121.    In fiscal years 2014 and 2013, Defendant TCI received at least $44,606,497 and $38,588,630 in Title IV funding, respectively.

**C.    Defendant Schools' Violations of the Incentive Compensation Ban.**

122.    Throughout his employment, EduTrek paid Relator substantial commissions/bonuses based directly on his success in various enrollment-related activities. Relator is aware that a significant number of employees of EduTrek were likewise paid commissions/bonuses based directly on their success in various enrollment-related activities.

123.    Additionally, throughout his employment with EduTrek, Relator is aware that Defendant Schools paid commissions to EduTrek based directly on the success of EduTrek's employees in activities intended to secure enrollments for Defendant Schools.

124.     EduTrek has paid illegal commission to its employees since at least July 2011. On information, Relator believes and alleges that such illegal commission payments are continuing to the present time.

125.     Defendant Schools have paid illegal commissions to EduTrek since at least July 2011. On information, Relator believes and alleges that such illegal commission payments are continuing to the present time.

126.     Through their payment of commissions to EduTrek and their contracts with EduTrek, Defendant Schools knowingly violated and continue to knowingly violate the Incentive Compensation Ban, as well as its accompanying and implementing regulations.

**Relator's Experience with Incentive Compensation at EduTrek**

127.     EduTrek sets appointments for prospective students with Defendant Schools, including and especially online education programs offered by these schools.

128.     As a College Search Advisor ("Recruiter"), Relator's job was to set appointments for prospective students with Defendant Schools and to provide certain preadmission consultation with prospective students for the purpose of setting appointments with Defendant Schools. The primary and ultimate objective of EduTrek's Recruiters, such as Relator, is to convince prospective students to set an appointment with a recruiter at one or more of Defendant Schools.

129.     EduTrek's Recruiters schedule up to four appointments for each prospective student, depending on certain factors such as the prospective student's location and desired area of study.

130.     EduTrek provides contact and other information about prospective student leads to its Recruiters through a computer database that can be accessed remotely. EduTrek has a computerized "lead platform," which is a reservoir of leads that the Recruiters use to get

contact information for prospective students. The Recruiters use this information to contact prospective students for the ultimate purpose and goal of setting an appointment with a Defendant School. EduTrek calls its internal lead platform database "Roy." EduTrek also provides it Recruiters with access to other lead platforms developed by affiliated entities. EduTrek's Recruiters use these lead platforms for the same purpose—to contact prospective students to set appointments with Defendant Schools.

131.    EduTrek's Recruiters call prospective students whose contact information is contained in Roy (and other lead platforms) and try to convince them to set an appointment with a recruiter at of one or more of the Defendant Schools.

132.    When the Recruiters seek to convince prospective students to set appointments, EduTrek's Recruiters will ask the prospective students a series of questions—set out in a script that EduTrek requires the Recruiters to use—to elicit information for Defendant Schools' use. Many of the questions are designed to determine whether the prospect will qualify for federal student aid programs and, if so, what types. The telephone calls that EduTrek's Recruiters make are recorded and stored for a certain amount of time.

133.    EduTrek obtains its leads from several different sources, including other lead generators. On information, Relator believes and alleges that there are two major sources of the leads—(1) companies in the "Opt In" industry, which mislead people into "opting in"—in other words, consenting—to receive a telephone solicitation and provide their personal information through deceptive websites, and (2) deceptive websites directly controlled by EduTrek that do the same thing. These practices are discussed further below.

134.    EduTrek paid Relator an hourly wage plus commissions/bonuses. Specifically, EduTrek paid Relator (1) a three dollar ($3) commission/bonus for each appointment with a Defendant School that he set for a prospective student, if the lead was generated from an

outbound call, and (2) a one dollar ($1) commission/bonus for each appointment generated from an inbound "transfer" call. The value of the commissions/bonuses could increase as the number of appointments set in a measurement period increased. The commissions/bonuses could be worth as much as twelve dollars ($12) per appointment as the number of appointments increased.

135.    EduTrek's Recruiters can schedule each prospective student with as many as four appointments with different Defendant Schools, and each scheduled appointment can earn the Recruiter a commission. Because they can earn multiple commissions for a single prospect, the Recruiters are motivated to sign up each prospective student with as many appointments as available.

136.    Defendant Schools pay EduTrek a commission of between $20 and $50—and sometimes more—per appointment.

137.    Critically, Defendant Schools only pay EduTrek a commission if (1) EduTrek's Recruiter obtains certain information from the prospective student through the preadmission consultation, including, inter alia, information about the prospective student's intended area of study and information about the prospective student's eligibility for Title IV programs, and (2) the prospective student sets an appointment with the Defendant Schools. If these conditions are not satisfied, Defendant Schools do not pay EduTrek a commission, and, in turn, EduTrek does not pay the Recruiter a commission. As a result, the Defendant Schools pay EduTrek a commission based on securing enrollments.

138.    Defendant Schools' payment of a commission to EduTrek determines whether EduTrek pays a commission to its Recruiters.

139.    In order to "match" a prospective student with a Defendant School, the EduTrek Recruiters must provide preadmission consultation to the prospective student concerning the

areas of study he or she may be interested in (*i.e.*, their degree interest). Since most of the people they call do not actually have an interest in attending college, Recruiters will prompt responses by asking the prospective students about their hobbies, general interests, and desired careers and then suggest degree programs and areas of study based on these responses. If the prospective student still cannot identify an area of study, the Recruiter will simply start listing every area of study offered at the Defendant Schools until the prospect agrees to one or more of them.

140.    EduTrek's Recruiters are instructed and trained to steer prospective students to programs offered by Defendant Schools. If a prospective student says that she wants to study a subject not offered by one of the Defendant Schools, Recruiters are trained to re-direct the prospective student to an area of study offered by one of the Defendant Schools. The Recruiters are trained to make it appear as if the areas of study they suggest are somehow related to the area of study the prospective student actually desires, though often the similarities are superficial and the two areas of study are nothing alike. For example, if a student says she wants to study to become an automotive mechanic, Recruiters will suggest that she instead study business management so that she can learn how to run an automotive repair business. Of course, the business management courses will not provide any education about automotive repair, the area of study the student actually desires.

141.    Non-profit schools in the area where a prospective student lives will often offer the area of study desired by the prospective student, but the Recruiter will never "match" the student to such schools and programs, even though EduTrek ostensibly represents to prospective students that it is a college-matching service that does just that. The Recruiters only "match" prospective students to Defendant Schools and the programs they offer. Recruiters coax prospective students away from lower-cost, local programs offering their

preferred area of study in favor of EduTrek's for-profit clients, even if doing so means steering students away from schools offering the exact programs they desire or away from lower-cost alternatives.

142.    In Relator's experience, because many of the prospective students were actually looking for employment, not education, as described further below, the Recruiters would often use the prospective student's hoped-for employment to suggest areas of study. For example, if the prospective student was looking for a job in the healthcare field, the Recruiter would suggest various healthcare-related education programs offered by Defendant Schools.

143.    The Recruiters are also required to consult with each prospective student about personal and demographic information that Defendant Schools use to determine the prospective student's eligibility for Title IV funding.

144.    The Recruiters are further required to gather other personal information from the prospective students, including contact information (*e.g.*, address, telephone, and email).

145.    Finally, the Recruiters must get the prospective students to set an appointment with one or more of the Defendant Schools and obtain their consent to receive telephone calls from recruiters at Defendant Schools with whom they have made appointments.

146.    The Recruiters input this information into computer-generated forms in EduTrek's database system. EduTrek's system then makes that information immediately available to Defendant Schools, who can "download"—or obtain—the appointment information. When they "download" the appointment information, the Defendant Schools pay—or agree to pay—EduTrek a commission at a predetermined rate. Often, the Defendant Schools' recruiters are so aggressive that the prospective students will begin receiving telephone calls from them within minutes, often before the telephone calls between the prospective students and EduTrek's Recruiters have even ended.

147.    While Relator and other EduTrek employees were paid partly on a commission/bonus basis and partly on an hourly basis, other Recruiters working for EduTrek—approximately 15—are (or were) paid exclusively on a commission basis. These employees were paid six dollars ($6) for every appointment based on an outbound call, and three dollars ($3) for every appointment made through an inbound call.

148.    The Recruiters, including Relator, have access to information about each of the appointments for which the Defendant Schools pay EduTrek a commission so that the Recruiters can track their performance and their own commission/bonus pay.

149.    EduTrek divides its Recruiters into teams and assigns each team a supervisor, which EduTrek calls the "team lead." In addition to the commissions/bonuses that EduTrek paid to the individual Recruiters, EduTrek also pays sizeable bonuses—up to one thousand dollars ($1000) per period (usually a month)—to the team lead whose team schedules the most appointments. EduTrek uses these contests to further incentivize the team leads to keep pressure on the Recruiters in their teams to set more appointments. These bonuses also violate the Incentive Compensation Ban.

150.    In approximately 2011, EduTrek's management made statements to the Recruiters, including Relator, acknowledging that paying commissions was "illegal" under the new regulations. In an apparent effort to hide its commission payment program under the new regulations, EduTrek instituted a tiered hourly wage system for *newly hired* Recruiters. However, EduTrek did not change its compensation system for its *existing* employees; it continued to pay some, like Relator, an hourly wage plus commissions/bonuses and others on a strict commission basis.

151.    The new tier system instituted in 2011 for new hires based the Recruiters' hourly wage on their rate of setting appointments (the "lead-to-call ratio")—the greater the

number of appointments set, the greater the hourly wage. The hourly wage under the tier system can be as low as $14 and as high as $22, depending on the appointment-setting rate. This is also a form of incentive compensation under the Incentive Compensation Ban and Incentive Compensation Regulations because it is incentive pay based on success in enrolling students. Paying a higher hourly wage based directly on enrollment success is a form of bonus or incentive compensation barred by the Incentive Compensation Ban.

152.    On information, Relator believes and alleges that as of mid-2014, approximately 20% of EduTrek's employees were paid on a straight commission basis, approximately 70% were paid on the tier rate structure, and approximately 10% were paid an hourly wage plus a commission/bonus, like Relator.

153.    Before EduTrek adopted the tier structure, Relator estimates that 20% of the Recruiters were paid on a straight commission basis and 80% were paid on the same system as Relator—an hourly wage plus commissions/bonuses.

154.    Although Relator recalls statements from EduTrek's management about changes to the Department of Education's regulations relating to Recruiters and commission compensation, as discussed above, he received no formal communications or training on these regulatory changes. Additionally, EduTrek made no changes to his compensation system or to the commission/bonus compensation paid to other existing Recruiters.

155.    Relator voluntarily quit his employment with EduTrek in July 2014 in part because he believed the company's practices were deceptive and abusive, as detailed further below.

### The Effects of Defendant Schools' Unlawful Practices

156.    Defendant Schools' incentive compensation practices have resulted in highly abusive recruiting tactics by EduTrek and its employees.

157.    In order to earn the lucrative commissions that Defendant Schools pay to it, EduTrek employs deceptive practices to generate additional prospective student leads.

158.    Indeed, one of the more troubling aspects of EduTrek's recruiting practices is how it obtains leads: "phishing" websites that pretend to offer help to those in need but are nothing but a mechanism for EduTrek to generate more leads. These phishing websites, of which there are many, appear on their face to advertise various forms of assistance to those in need, such as help finding a job or applying for government benefits. The websites entice their visitors with promises of assistance and then trick them into providing their contact information to EduTrek or other affiliated companies, which then provide the information to EduTrek's Recruiters.

159.    Although the websites and targets frequently change (and will appear to go dormant at various periods, perhaps to avoid detection), the essential scheme remains the same. For example, one of the common schemes is the use of websites that appear to advertise available jobs. On their face, the websites seem to list available low-skill jobs. One of the websites was www.localemploymentnetwork.org. As of October 29, 2014, the website stated in bold letters on the homepage: "Discover the Latest Jobs Opportunities in Your Area!" and asked visitors to enter their preferred "Job Title" and Zip code. (https://web.archive.org/web/20141029153826/http://www.localemploymentnetwork.org/)

160.    However, in order to see any information about the supposed jobs, the website required visitors to provide their contact information. The screen that prompted the visitor for his or her contact information stated in fine print that by submitting contact information, the visitor was consenting to receive telephone solicitations about educational opportunities. Although this website has subsequently been shut down, it appeared like this until recently:



161.    After a visitor submitted his or her contact information, the website displayed nothing more than a list of job postings "scraped" from an unrelated, legitimate job search website (Indeed.com). In other words, while the website www.localemploymentnetwork.org appeared to promise visitors that it would provide them with information about available jobs in their area, it was nothing more than a mechanism for EduTrek or an affiliated company to obtain contact information for people looking for work.

162.    EduTrek's Recruiters then use that contact information to call and persuade these people looking for jobs that in order to obtain a job—or to get a better job—they should consider additional education at one or more of the Defendant Schools.

163.    While Relator worked for EduTrek, the phishing websites constantly changed and evolved. In addition to phishing websites relating to jobs, EduTrek or its affiliates also used websites that appeared to offer help applying for certain government benefits, like

Medicaid or Medicare, unemployment insurance, food stamps, and subsidized housing, as well as private low-income assistance programs, like energy assistance programs. Other websites promised free gift certificates. In reality, such websites offered no such assistance or gifts and were nothing more than vehicles for obtaining more contact information that EduTrek could give to its Recruiters to use to persuade more people to set appointments with Defendant Schools.

164.    Certain codes imbedded in the prospective lead contact information used by Relator and the other Recruiters indicate the source of the lead, which can often be traced to a particular phishing website (e.g., "FSA" for contacts from a website relating to bogus food stamp assistance). Relator and the other Recruiters are able to discern the meaning of the codes because frequently the people they call will tell them that they had *only* been searching on the Internet for the particular benefit or type of assistance supposedly offered by the deceptive website referenced by the code.

165.    Relator estimates that EduTrek's Recruiters contact 20,000 people per day. EduTrek's records indicate that its Recruiters set approximately 1,000 appointments with Defendant Schools each business day.

166.    To give a sense of the impacts to Title IV programs from such activity, consider that, for example, Defendant CEHE targets a thirty-three percent (33%) conversion rate for all prospective student leads. This means that CEHE's enrollment personnel enroll approximately one out of every three prospective students. It is likely that the other Defendant Schools have similar conversion rates.

167.    Assuming Defendant Schools are enrolling approximately one out of every three prospective students for which EduTrek sets appointments, the available data suggest that EduTrek is directly responsible for helping Defendant Schools enroll approximately 3,600 new

students each and every month,2 the vast majority of which receive Title IV program funds. On information, Relator believes and alleges that EduTrek provides a large portion of the leads that Defendant Schools use to recruit students.

168.    Using published public reports of tuition at for-profit colleges, EduTrek's and Defendant Schools' actions are estimated to result in approximately $750 million in additional expenditures from Title IV programs each and every year. In other words, without EduTrek's and Defendant Schools' activities, as alleged in this Complaint, approximately $750 million of Title IV program funds would not be expended each year.

169.    Based on Relator's personal experience, many people have been deceived into providing their contact information to EduTrek or its affiliates under the guise of getting information about job leads, assistance with government services, or help with low-income assistance programs.

170.    Relator has personally spoken to thousands of people who have told him that they had only provided their contact information for the purpose of obtaining job listings (or other assistance) and had no interest in further education. Nevertheless, EduTrek required Relator to try to convince every person he contacted that he or she should consider attending school at one of the Defendant Schools, and, in particular, should set an appointment with a recruiter at one or more of the schools.

171.    Because the vast majority of the people that EduTrek's Recruiters call are not interested in pursuing education, and only provided their contact information to get

---

2 Based on the data available, this is likely a conservative estimate. Since EduTrek often sets multiple appointments for the same prospective student, this number is adjusted to reflect that a student can only enroll once, even if the student has been scheduled for appointments with more than one school. This rough calculation assumes that the EduTrek sets, on average, two appointments for each prospective student.

information about possible jobs or help obtaining government assistance, the Recruiters have to persuade most of the people they call to even consider pursuing education. Many of the Recruiters use the current difficult situation of the people they contact—their current unemployment or their need for government assistance—to shame and embarrass the people they call into considering enrolling at a Defendant School.

172.    Relator often felt uncomfortable trying to convince people who were not interested in additional education and likely could not benefit from such education to set an appointment with a Defendant School.

173.    EduTrek provides its Recruiters with training on how to overcome common (and wholly legitimate) reasons why the people they contact are not interested in or capable of attending college. EduTrek expects its Recruiters to pursue these strategies and measures their success by their ability to implement these strategies. Indeed, the most important measure of Recruiters' success is the lead-to-call ratio, which is the number of appointments set per call. EduTrek expects Recruiters to try to persuade everyone they call to set an appointment with a Defendant School, regardless of interest or present ability.

174.    For example, Relator would receive contact information for senior citizens who had only been searching on the Internet for help obtaining Medicaid assistance. EduTrek nonetheless expected Relator, as it does all of its Recruiters, to try to convince these people to set an appointment with a Defendant School. Indeed, EduTrek trains its Recruiters to use flattery to get senior citizens to set appointments with Defendant Schools.

**Online Students Were a Large Portion of the Prospective Students**

175.    EduTrek's system would automatically provide the Recruiters, such as Relator, with a list of the schools and programs available to the prospective student based on where the prospective student lived. When there were no physical campuses located near the prospective

student, Recruiters would attempt to schedule the prospective student with appointments for online programs at various Defendant Schools.

176.    Students who attend Defendant Schools online typically never set foot in an actual brick-and-mortar campus, but instead enrolled and took courses exclusively through Internet-based programs.

177.    These students typically have all of their interactions with recruiters from Defendant Schools, including the initial appointment, over the telephone or via email.

178.    Relator estimates that approximately eighty percent (80%) of the appointments that he set up were for online programs.

179.    According to Defendant Schools' own reporting and records, the vast majority of their students are enrolled in fully (or exclusively) online programs.

180.    For example, approximately 90% of CTU's enrollments are fully online, as are 90% of AIU's enrollments.

181.    According to the Defendant AEG's 2014 SEC Form 10-K, the "majority" of the more than 230,000 students attending University of Phoenix "attend classes exclusively online."

182.    Defendant BEI, which operates Ashford University, reports that in 2014, it had 742 students enrolled in "campus-based" program but over 55,000 students enrolled online. It reported similar numbers for 2013, 2012, and 2011.

183.    For every student who attends GCU's physical campus, five students are enrolled in its online programs.

184.    Defendant EMC specifically "target[s]" those who are "focused on the practicality and convenience of online education."

185.    Kaplan University's parent company (now Defendant ECA) reported in 2012 that "[m]ost of Kaplan University's programs are offered online," with more than 38,000 students in online programs and only 5,600 students at physical campuses.

**D.    Defendant Schools Violated the Incentive Compensation Ban and Incentive Compensation Regulations**

186.    As described above, before Defendant Schools pay a commission to EduTrek for a lead, EduTrek's Recruiters must do more than simply provide Defendant Schools with contact information. Instead, Defendant Schools pay EduTrek a commission only if the prospective student *and* EduTrek undertake "additional conduct [and] action" within the meaning of the Incentive Compensation Regulations.

187.    Defendant Schools do not pay EduTrek a commission unless at least the following additional actions are taken: (1) EduTrek's Recruiter consults with the prospective student about his possible academic interests and, if necessary, steers him to programs offered by Defendant Schools (i.e., preadmission activities), (2) the Recruiter consults with the prospective student to obtain information that Defendant Schools can use to determine the prospective student's eligibility to participate in Title IV programs (i.e., preadmission activities), (3) the Recruiter schedules the prospective student for an appointment with the Defendant School (i.e., schedules an appointment); and (4) the prospective student agrees to participate in an appointment with the Defendant School. EduTrek's Recruiters must do all of these things in order to earn a commission for themselves and for EduTrek.

188.    Likewise, EduTrek does not pay its Recruiters a commission unless the Recruiters successfully undertake all four activities.

189.    Defendant Schools are responsible for any violations of the Incentive Compensation Ban committed by EduTrek. "[I]t is longstanding Department policy that an

institution is responsible for the actions of any entity that performs functions and tasks on the institution's behalf." 75 Fed. Reg. 66832, 66875 (Oct. 29, 2010); *see also* 34 C.F.R. § 668.14(25) (An institution is "liable for all . . . [r]eturns of Title IV program funds that the institution or its servicer may be required to make"); 34 C.F.R. § 668.25(c). As such, Defendant Schools are responsible for EduTrek's violations of the Incentive Compensation Ban.

190.    Additionally, because Defendant Schools are obligated to ensure that EduTrek complies with the Incentive Compensation Ban by virtue of 34 C.F.R. § 668.25(c) ("In a contract with an institution, a third-party servicer shall agree to . . . [c]omply with all statutory provisions of or applicable to Title IV of the HEA [and] all regulatory provisions prescribed under that statutory authority."), the fact that EduTrek pays its Recruiters commissions and varies their hourly pay based on enrollment-related activities makes Defendant Schools liable for failing to prevent EduTrek's violations of the Incentive Compensation Ban.

### Defendant Schools Knowingly Violated the Incentive Compensation Ban

191.    Under the False Claims Act,

the terms "knowing" and "knowingly"—

(A)  mean that a person, with respect to information—

(i)  has actual knowledge of the information;

(ii)  acts in deliberate ignorance of the truth or falsity of the information; or

(iii)  acts in reckless disregard of the truth or falsity of the information; and

(B)  require no proof of specific intent to defraud.

31 U.S.C. § 3729(b)(1).

192.    Defendant Schools knew (and know) that their commission payments violate the Incentive Compensation Ban and Incentive Compensation Regulations. Consequently, when Defendant Schools made statements and certifications in their PPAs and other documents (such as compliance audit Management Assertions, G5 Certifications, school certifications associated with FDLP and FFELP loans, and MPNs), regarding their compliance with the Incentive Compensation Ban and eligibility for Title IV funding, those statements were knowingly false. Defendant Schools' compensation practices make their statements and certifications of compliance in their PPAs, G5 Certifications, compliance audit Management Assertions, and other documents knowingly false.

193.    For example, Defendant CEC has acknowledged that "[a]n institution participating in Title IV Programs cannot provide any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or Title IV financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the award of student financial assistance." CEC further acknowledged that the "[n]ew regulations issued in October 2010 which became effective July 1, 2011" should have led to "changes in contractual and other arrangements with third parties" and changed its "business arrangements with third-party lead generators and other marketing vendors." However, CEC did not change its payment of commissions to EduTrek for enrollment-related activities and did not require EduTrek to change its commission payment practices for the Recruiters for the same activities.

194.    Defendant GCU has acknowledged that "[t]he new rules effective July 1, 2011 eliminated the 12 safe harbors" and "[t]he restrictions of the incentive compensation rule . . . *extend to any third-party companies that an educational institution contracts with for student recruitment*, admissions, or financial aid awarding services." (emphasis added).

195.    Defendant ITT has acknowledged that the 2011 regulations resulted in "the elimination of 12 safe harbors that set forth certain types of activities and payment arrangements (the 'Safe Harbors') that an institution may carry out without violating the rules that prohibit payment of any commission, bonus or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any person or entity engaged in any student recruitment or admission activity or in making decisions regarding the awarding of Title IV Program funds (the 'Incentive Compensation Prohibition')," and that violating the regulations could subject it to suits for "violations of the False Claims Act related to the Incentive Compensation Prohibition."

196.    Defendant AEG has acknowledged that "[t]he incentive compensation regulations, effective July 1, 2011, removed certain 'safe harbors' that had previously defined the limits of the prohibition on the payment of any incentive compensation to persons involved in enrollment and financial aid functions." AEG understood that the Department of Education had "clarified the scope of these regulations in a Dear Colleague letter dated March 17, 2011."

197.    Defendant EMC has acknowledged that "[u]nder the new regulation, effective July 1, 2012 [sic] all twelve safe harbors were eliminated. The new regulation prohibits any commission, bonus, or other incentive payment based in any part, directly or indirectly, upon success in securing enrollments or the award of financial aid, to any person or entity who is engaged in any student recruitment or admission activity, or in making decisions regarding the award of Title IV program funds."

198.    Kaplan's then-parent company (now ECA) acknowledged in 2012 that "[e]ffective July 1, 2011, the [Department of Education] enacted changes to the incentive compensation rule that reduced the scope of permissible payments under the rule and expanded

the scope of payments and employees subject to the rule." It also recognized that the Department of Education "issued a 'Dear Colleague Letter,' providing guidance on these rules."

199.    DeVry has acknowledged knowing that "[a]n educational institution participating in Title IV programs may not pay any commission, bonus or other incentive payments to any person involved in student recruitment or admissions or awarding of Title IV program funds, if such payments are based directly or indirectly in any part on success in enrolling students or obtaining student financial aid" and that major regulatory changes were made to the applicable regulations in July 2011.

200.    Defendant BEI has acknowledged that "[t]he Department eliminated all 12 safe harbors, effective July 1, 2011, taking the position that any commission, bonus or other incentive payment based in any part, directly or indirectly, on securing enrollments or awarding financial aid is inconsistent with the incentive payment prohibition in the Higher Education Act."

201.    At the time that Defendant Schools stated in their PPAs and other documents that they would not pay commissions to any person or entity based on their success in securing enrollments and would not contract with any person or entity who pays commissions based on success on enrolling students, Defendant Schools knew that they were paying, and intended to continue to pay, commissions to EduTrek based on EduTrek's and its Recruiters' success in enrolling students and that EduTrek intended to continue paying its employees incentive compensation based on their success in enrolling students.

202.    Defendant Schools knew that their misrepresentations regarding compliance with the Incentive Compensation Ban would result in the payment of federal funds and that a reasonable and foreseeable consequence of such misrepresentations was that such funds would be paid out.

E.    **Defendant Schools' Submission of False Claims**

203.    Every request for a federal grant, every request for a loan under FDLP, every request for a federally guaranteed loan under FFELP, every interest payment on a subsidized Stafford Loan, and every government payment on a loan made on behalf of a student attending Defendant Schools constitutes a separate false claim.

204.    On information, Relator believes and alleges that a large majority of students attending Defendant Schools receives Title IV funding assistance in one form or another.

205.    For example, at certain campuses of CEHE's schools, more than 90% of students received Title IV financial assistance, including more than 99% at some campuses.

206.    At EMC, "[m]ost of the students at [its] schools based in the United States rely, at least in part, on financial assistance to pay for the cost of their education," which comes mainly from Title IV programs. EMC reported 79% of its revenue from Argosy University came from Title IV programs in 2013, while 80% came from those programs in 2012.

207.    At CEC, "[a] significant portion of [its] U.S.-based students rely on Title IV Programs, and [CEC] derive[s] a substantial portion of [its] revenue and cash flows from Title IV Programs." For the fiscal years ended December 31, 2014 and 2013, "approximately 90% of [CEC's] U.S.-based students who were in a program of study at any date during [those years] participated in Title IV Programs." "[F]or the fiscal year ended December 31, 2012, approximately 91% of [CEC's] U.S.-based students who were in a program of study at any date during that year participated in student aid and loans under Title IV Programs . . . ."

208.    Over 80% of AEG's revenues from the University of Phoenix came from Title IV programs in fiscal years 2012, 2013, and 2014. AEG has stated that "[a] substantial majority of [its] fiscal year 2014 total consolidated net revenue was derived from receipt of

Title IV program funds disbursed to our students." AEG made similar statements for fiscal years 2011, 2012, and 2013.

209.    GCU's revenues from Title IV programs have exceeded 75% in fiscal years 2011, 2012, 2013, and 2014. According to GCU, it "derives a substantial portion of its revenues from student financial aid received by its students under the Title IV programs administered by the Department of Education pursuant to the Higher Education Act."

210.    In 2013, ITT received approximately 82% of its revenue from Title IV programs. That figure was 67% in 2011 and 80% in 2012.

211.    At TCI, more than 77% of its students received some type of funding from Title IV programs in fiscal year 2012.

212.    In the years ended December 31, 2014, 2013 , 2012 and 2011, Ashford University derived 83.4%, 85.6%, 86.4% and 86.8%, respectively, of its revenues from students who participated in Title IV programs.

213.    In 2010 and 2011, more than 70% of DeVry's revenues came from Title IV programs, and DeVry's revenues from Title IV programs have been similarly substantial in more recent years.

214.    Kaplan's then-parent company (now ECA) reported in 2012 that "[f]unds provided under the U.S. Federal student financial aid programs that have been created under Title IV of the U.S. Federal Higher Education Act of 1965, as amended (Higher Education Act), historically have been responsible for a majority of the [its] revenues" and that "[d]uring 2012, funds received under Title IV programs accounted for approximately $882 million, or approximately 77%, of total [Kaplan] revenues." These trends have continued in recent years.

215.    Each grant award, disbursement of FDLP loans, and government repayment of loan interest or defaulted loan principal was caused by Defendant Schools' false certifications

and statements in the PPAs, compliance audit Management Assertions, G5 Certifications, MPNs, school certifications, and other documents that Defendant Schools were in compliance with the Incentive Compensation Ban and were therefore eligible to receive Title IV funding. Defendant Schools made these false certifications and statements despite the fact that they had actual knowledge of their falsity. Each request for payment constitutes a false claim under the FCA.

### F.    Defendant EduTrek Conspired with Defendant Schools to Enroll Students in Violation of the Incentive Compensation Ban.

216.    Defendant EduTrek was a key player in Defendant Schools' efforts to obtain Title IV funding and, by extension, the Defendant Schools' violation of the Incentive Compensation Ban.

217.    As explained above, EduTrek acts as the front-line recruiter for Defendant Schools, using psychological manipulation to generate interest in education and then funneling these "prospective students" to Defendant Schools. EduTrek's Recruiters collect information from these students, "match" them with Defendant Schools' programs, and arrange appointments with the Defendant Schools' own recruiters.

218.    EduTrek's revenue is based primarily on the commission payments it receives from the Defendant Schools, which are made in violation of the Incentive Compensation Ban. EduTrek does not charge prospective students for its so-called services.

219.    EduTrek's executive team has experience with Title IV financial aid and Department of Education regulations, which include the Incentive Compensation Ban and Incentive Compensation Regulations.  For instance, EduTrek had a Director of Financial Aid Services who was a "senior financial aid services professional" and who previously had "a successful 24-year track record in education finance and the Federal Family Education Loan

Program." EduTrek's Financial Aid Services Director previously worked for various entities involved in Title IV financial aid, including "Brazos Higher Education Service Corporation, Discover Financial Services, and Citibank Student Loan Corporation." EduTrek touted the Brazos Group "as the sixth largest holder of student loans in the United States."

220.    Because of its management's expertise, EduTrek knows of the restrictions imposed by the Incentive Compensation Ban.

221.    Additionally, as alleged above, EduTrek's management acknowledged to Relator and the other Recruiters that they knew that paying commissions based on enrollment-related activities was illegal under the new July 2011 regulations, demonstrating an awareness of the Incentive Compensation Ban and Incentive Compensation Regulations.

222.    EduTrek nevertheless agreed to perform student enrollment activities for, and accept commission payments from, Defendant Schools in violation of the Incentive Compensation Ban.

## VII.    CLAIMS FOR RELIEF.

### CLAIM I

### VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT

(31 U.S.C. § 3729(a)(1)(A) (2009) – False Claims Regarding Compliance With Title IV
– Against All Defendant Schools)

223.    Relator re-alleges and incorporates herein paragraphs 1 through 222.

224.    From July 2011 to the present, Defendant Schools knowingly presented or caused to be presented false or fraudulent claims for payment to the United States, in violation of the FCA, 31 U.S.C. § 3729(a)(1)(A). Specifically, Defendant Schools knowingly submitted or caused to be submitted false certifications regarding compliance with the requirements of Title IV of the HEA, in, inter alia, their PPAs, G5 Certifications, and annual financial and compliance

audits, as well as in student loan and grant applications, in order to obtain eligibility to participate in Title IV programs and receive Title IV funding, when in fact Defendant Schools' compensation practices did (and do) not comply with Title IV of the HEA and its associated regulations.  In submitting or causing to be submitted such certifications and applications, Defendant Schools acted with actual knowledge, reckless disregard, or deliberate ignorance of the truth or falsity of the claims.

225.    Defendant Schools made express representations in writing to the Department of Education that they would not pay commissions to any person or entity based directly or indirectly on success in securing enrollments. Defendant Schools also made express representations that they would not contract with any person or entity who paid incentive compensation to any other person based directly or indirectly on success in securing enrollments. At the same time Defendant Schools made these representations, they knew that these representations were false, and would continue to be false, because Defendant Schools were paying commissions to EduTrek based on its success in securing enrollments and had contracted with EduTrek, which they knew was also paying incentive compensation to its employees based directly on their success in securing enrollments.

226.    These fraudulent representations were material to the Department of Education's decision to make Defendant Schools eligible for these financial aid programs and to pay funds under Title IV programs. Therefore, Defendant Schools fraudulently induced the Department of Education to make Defendant Schools eligible to participate in the Title IV programs, and each and every one of the claims they submitted or caused a student to submit violated the FCA.

227.    The fact that compliance with the Incentive Compensation Ban was material to the government's decision to make payments under Title IV programs, combined with the fact

that Defendant Schools, knowing that they were in violation of the Incentive Compensation Ban and therefore ineligible to receive such student financial aid, submitted claims for student financial aid, caused students to submit claims for student financial, and/or received such aid, makes Defendant Schools liable under the FCA.

228.    In submitting or causing to be submitted such claims, Defendant Schools acted with actual knowledge, reckless disregard, or deliberate ignorance of the truth or falsity of the claims.

229.    By virtue of these false or fraudulent claims, the United States suffered damages in an amount to be determined at trial.

## CLAIM II

## VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT

(31 U.S.C. § 3729(a)(1)(B) (2009)  -  False Statements and Records Regarding Compliance with Title IV  --  Against All Defendant Schools)

230.    Relator re-alleges and incorporates herein paragraphs 1 through 229.

231.    From July 2011 to the present, Defendant Schools knowingly made, used, or caused to be made or used false records or statements material to false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(1)(B). Specifically, Defendant Schools knowingly made, used, and caused to be made or used, false certifications regarding compliance with the requirements of Title IV of the HEA, in, inter alia, their PPAs, G5 Certifications, and annual compliance audits, as well as in student loan and grant applications, in order to obtain eligibility to participate in Title IV programs and to receive Title IV funding, when in fact, Defendant Schools' compensation practices did not comply with Title IV of the HEA and its associated regulations.

232.    In making, using, or causing to be made or used such false records and statements, Defendants acted with actual knowledge, reckless disregard, or deliberate ignorance of the truth or falsity of the claims.

233.    These false records and statements were material to the Department of Education's decision to make Defendant Schools eligible for these financial aid programs and to pay funds under Title IV programs. Defendant Schools fraudulently induced the Department of Education to make Defendant Schools eligible to participate in the Title IV programs, and each and every one of the claims they submitted or caused a student to submit violated the FCA.

234.    By virtue of these false or fraudulent claims, the United States suffered damages in an amount to be determined at trial.

## CLAIM III

### VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT

(31 U.S.C. § 3729(a)(1)(C) (2009) – Conspiracy to Commit Violations of False Claims Act – Against All Defendant Schools and EduTrek)

235.    Relator re-alleges and incorporates herein paragraphs 1 through 234.

236.    Defendant Schools and EduTrek have entered into agreements under which, in violation of the Incentive Compensation Ban, Defendant Schools make commission payments to EduTrek for success in student enrollment activities.

237.    Defendant Schools and EduTrek committed all of the acts pursuant to their agreements knowingly and in furtherance of Defendant Schools enrolling additional students who seek Title IV financial aid, which is ultimately paid to Defendant Schools.

238.    By virtue of this conspiratorial conduct, the United States suffered damages in an amount to be determined at trial.

## VIII.    PRAYERS FOR RELIEF

WHEREFORE, Relator, on behalf of himself and the United States, demands and prays that judgment be entered in their favor against Defendants, as follows:

1.      On Claims I, II, and III, under the FCA, as amended, for triple the amount of the United States' damages plus interest and such civil penalties as are allowable by law, together with the costs of this action and such other and further relief as may be just and proper;

2.      That judgment be entered in favor of Relator and the United States and against the Defendants for actual damages, pre-judgment and post-judgment interest, litigation costs, investigative costs, disgorgement of all profits, and an accounting, to the fullest extent as allowed by law, and for such further relief as may be just and proper;

3.      That Relator be awarded all reasonable attorneys' fees and costs, pursuant to 31 U.S.C. § 3730;

4.      That to the extent the United States Government has intervened in this action, the Relator be awarded an amount of at least 15% but not more than 25% of the proceeds of any award or the settlement of the intervened claims; and

5.      That to the extent that the United States Government has not intervened in this action, the Relator be awarded an amount that the Court decides is reasonable, which is not less than 25% nor more than 30% of the proceeds of any award or settlement of the non-intervened claims.

## IX.    JURY TRIAL DEMAND

1.      Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator demands a jury trial.

DATED this 15th day of July 2016.

/s/ Brandon J. Mark
BRANDON J. MARK
PARSONS BEHLE & LATIMER

ROBERT J. NELSON
LEXI J. HAZAM
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP

*Attorneys for Relator*